1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   MAHMOUD SAQQA,                    No. 2:20-cv-00331 WBS AC

13              Plaintiff,

14        v.                           ORDER RE DEFENDANTS' MOTION
                                       FOR SUMMARY JUDGMENT
15   SAN JOAQUIN COUNTY; KRIS BALAJI,

16              Defendants.

17

18                         ----oo0oo----

19        Plaintiff Mahmoud Saqqa brought this action against his

20   former employer San Joaquin County ("the County") and his former

21   supervisor, Kris Balaji, alleging that defendants discriminated

22   against him and harassed him on the basis of his race and his age

23   in violation of 42 U.S.C. § 1981 and California Government Code

24   § 12940, et seq.  (See Compl. (Docket No. 1).)  Defendants now

25   move for summary judgment on all claims.  (Mot. for Summ. J.

26   (Docket No. 14-1).)

27   I.   Factual Background

28             Saqqa began his employment with the County in 1988.

                                    1

1   (Defs.' Sep. Statement of Undisputed Material Facts ("Defs.'
2   SUF") No. 1 (Docket No. 14-2).)  Between 2000 and 2019, Saqqa
3   worked as a Senior Civil Engineer or "Engineer V" at the head of
4   the County's Bridge Engineering Division.  (Id. at No. 2; Pl.'s
5   Statement of Disputed Facts in Opp'n to Mot. for Summ. J. ("Pl.'s
6   SDF") No. 2 (Docket No. 16-3); Pl.'s Exs. in Opp'n to Mot. for
7   Summ. J. ("Pl.'s Exs."), Ex. 10 ("Saqqa Decl.") ¶ 4 (Docket No.
8   16-2).)  As an Engineer V, Saqqa supervised and directed
9   subordinate engineers and administrative and technical personnel
10  in the planning, development, design, and construction of public
11  work projects and programs.  (Pl.'s Ex. 1 ("Engineer V Job
12  Description") at 1 (Docket No. 16-1).)  Saqqa was also
13  responsible for reviewing and approving plans and cost estimates
14  for construction projects, conducting feasibility studies, and
15  consulting with management and administration regarding the
16  establishment of engineering policies and procedures in the
17  department and for the County.  (Id.)

18      Saqqa's direct supervisor was Mike Selling, a Deputy
19  Director at the County's Public Works Department.  (Id. at No.
20  13.)  Selling reported to defendant Kris Balaji, who was first
21  hired by the County in October 2015 as the Director of Public
22  Works.  (Id. at No. 4.)  Besides a brief stint between July 2020
23  and January 2021 when Balaji left to work at Caltrans, Balaji has
24  held this position since his hire.  (Id. at Nos. 4-5.)

25      Saqqa was born in Jordan and states that his race is
26  Caucasian.  (Def.'s SUF No. 3.)  Balaji was born in India and his
27  race is Asian.  (Def.'s SUF No. 6.)

28      A.   Creation of the ESM Position

2

1    Shortly after Balaji was hired in 2015, Selling began

2    advocating for the County to create two "Engineering Services

3    Manager," or "ESM," positions above the Bridge Engineering

4    Division and the Transportation Division in the County's

5    organizational hierarchy.  (Defs.' SUF No. 14.)  Whereas the

6    Engineer V position is largely focused on managing projects and

7    is more "hands-on," the ESM position is more of a management

8    role, in that it entails managing staff and administering

9    engineering-related programs, projects, and functions within the

10   Public Works Department.  (Defs.' SUF No. 10.)

11   Balaji shared Selling's view, and the two submitted a

12   request to the County's Human Resources to create the two

13   positions.  (Id. at Nos. 15-16.)  Human Resources only approved

14   one ESM position, however, which would oversee both the Bridge

15   Engineering and Transportation Divisions.  (Id. at No. 17.)  The

16   County determined that it would only recruit candidates for the

17   new ESM position from within existing departments, and scheduled

18   interviews for November 2017.  (Id. at No. 20; Pl.'s Statement of

19   Additional Disputed Facts ("Pl.'s SADF") No. 123 (Docket No. 16-

20   4).)  Human Resources screened applications and identified three

21   qualified candidates.  (Pl.'s SADF No. 124.)  One of those

22   candidates left employment with the County before the interviews.

23   (Id.)  The other two candidates were Saqqa and Firoz Vohra, the

24   Engineer V who headed the Transportation Division.  (Id.; Defs.'

25   SUF No. 12.)  Like Balaji, Vohra is from India and states that

26   his race is Asian.  (Id.)

27   B.   The Interview Process

28   In approximately March 2017, Saqqa, Balaji, Selling,

3

and Vohra met regarding the new ESM position.  (Defs.' SUF No.
18.)  According to Saqqa, Balaji stated that Vohra would be
receiving a five percent equity increase in his pension based on
his work on a Capital Improvement Project and retire soon after.
(Defs.' Index of Exs. ("Defs.' Exs."), Ex. I ("Saqqa Dep.")
40:16-43:4 (Docket No. 14-3).)  He then stated, "you know what
happens next" and that the Department would be moving forward
with hiring for the ESM position.  (Id.)  Saqqa understood Balaji
to be suggesting that, because Vohra would be retiring soon,
Saqqa would likely be selected for the ESM position.  (Id.)

Saqqa states that later that year, in August 2017,
Vohra visited Saqqa in his office and told him that Balaji had
instructed Vohra to tell Saqqa to withdraw from consideration for
the ESM position so that he could appoint Vohra to the position.
(Id. at 44:17-45:17.)  Saqqa refused to withdraw from
consideration and told Vohra that he fully intended to compete
for the position.  (Pl.'s Ex. 9 ("Selling Decl.") ¶ 14 (Docket
No. 16-2).)

The day before the scheduled interviews for the ESM
position in November 2017, Balaji directed Selling to cancel the
interviews, over Selling's objection.  (Id. at ¶ 15.)  Balaji
states that he had concerns that Selling would simply pick one of
the two candidates to fill the position, regardless of whether
either of them demonstrated that he could succeed in the job
during the interview process.  (Defs.' SUF No 21.)  Balaji
believed that it would be better to delay the interviews until
after the candidates had had the opportunity to apply to the
County's new "Trailblazer Program," a leadership and development

4

1  program which he felt could improve the candidates' leadership
2  skills and abilities.  (Id. at No. 22.)

3         Saqqa applied for the Trailblazer Program and received
4  an interview in December 2017, but was not ultimately selected
5  for the Program.  (Defs.' SUF No. 24.)  Vohra did not apply for
6  the Trailblazer Program.  (Id.)  Once it became apparent that
7  neither candidate would participate in the Trailblazer Program,
8  Balaji rescheduled the ESM interviews for February 2018.  (Id. at
9  Nos. 26-27.)  Saqqa and Vohra were the only two candidates
10 interviewed.  (Id.)

11        In what Saqqa contends was an unprecedented change to
12 the County's standard interview process, Balaji placed himself on
13 the interview panel, even though the ESM would be reporting
14 directly to Selling, not him.  (Pl.'s SADF No. 130, 141.)  Balaji
15 also requested that a representative from Human Resources,
16 Jennifer Goodman, be placed on the panel.  (Id.)  In addition to
17 Balaji and Goodman, the interview panel consisted of the Deputy
18 Public Works Director for Operations, Jim Stone, and Selling.
19 (Id. at No. 28.)

20        The interview consisted of each panelist asking Saqqa
21 questions in turn.  (Defs.' SUF No. 29.)  Following the
22 interview, the panel members discussed each candidate's
23 performance.  (Id. at Nos. 32-37; Pl.'s SADF No. 145.)  Stone
24 felt that Saqqa had performed better than Vohra in the interview,
25 but believed that the position "would have been a stretch" for
26 Saqqa and was not completely satisfied that Saqqa was ready to
27 take on the ESM position.  (Defs.' SUF Nos. 34-36.)  Goodman
28 agreed that Saqqa had performed better in the interview, but also

felt that Saqqa had not demonstrated what he needed to earn a promotion to a senior management role.  (Id. at No. 37.)  The only panel member who appears to have felt that Saqqa should get the role is Selling.  (Pl.'s SADF No. 145.)

Based on a declaration submitted by Selling, Saqqa contends that Balaji first advocated that Vohra had performed better, but later seemed to shift his position to state that neither candidate had met his expectations once he heard that other panel members thought Saqqa had performed better.  (Id.) No other panel member confirms this account, however; the other panelists simply testified that Balaji did not think either candidate was qualified for the position.  (Defs.' SUF Nos. 37; Defs.' Ex. F ("Stone Dep.") 38:23-39:7; 41:3-11.)

As the Department's director, Balaji was vested with final authority to decide whether to hire or promote a candidate. (Defs.' SUF No. 38.)  Ultimately, Balaji decided not to promote either Saqqa or Vohra to the ESM position.  (Id. at Nos. 43-46.) In subsequent discussions concerning the interview, Selling, Goodman, and Balaji each told Saqqa that Balaji was not going to fill the position because neither candidate had met Balaji's expectations for the role.  (Defs.' SUF Nos. 44-45.)

Vohra also met with Selling and Balaji after his interview.  (Defs.' SUF No. 55.)  Balaji similarly told Vohra that he had not displayed the qualities Balaji was looking for in an ESM, i.e., the right leadership qualities.  (Id. at No. 56.) Vohra resigned his employment with the County shortly after this meeting, largely because he did not receive a promotion to the ESM position.  (Id. at No. 58.)

1            C.    Saqqa's Allegations of Harassment

2            Saqqa alleges that Balaji subjected him to excessively

3     harsh and inappropriate criticism beginning between August 2017

4     and February 2018, around the time when Balaji canceled and then

5     rescheduled the ESM position interviews.  (Defs.' SUF No. 63.)

6     Though Saqqa feels Balaji had generally been very professional

7     and fair with him prior to August 2017, Saqqa describes a change

8     in Balaji's behavior in which Balaji began to yell at him and

9     berate him over seemingly minor mistakes.  (See Pl.'s SDF Nos.

10    60-106; Pl.'s SADF Nos. 151-176.)

11            For instance, in late 2017, Balaji gave Saqqa a work

12    assignment on a Friday afternoon despite being aware that Saqqa

13    had planned a vacation to Las Vegas that weekend.  (Def.'s SUF

14    No. 64.)  When Saqqa told Balaji that he would be driving and

15    thus would be unable to complete the project, Balaji told him "I

16    challenge you to do that."  (Id. at No. 65.)  Similarly, sometime

17    prior to February 2018, Saqqa states that Balaji "challenged" him

18    to apply for the Trailblazer program.  (Id. at No. 68.)  Saqqa

19    perceived this "challenge" to be harassing because Balaji only

20    challenged him to apply for the program, not others.  (Id.)

21            Saqqa also describes a number of incidents in which

22    Balaji berated him for perceived mistakes in front of his

23    coworkers or even his subordinates.  In one such instance, Saqqa

24    states that Balaji screamed and yelled at him for approving a

25    poor-quality submittal for the "Solid Waste" project.  (Id. at

26    No. 69.)  This criticism continued through another meeting later

27    the same day and to a board agenda meeting held at a later date,

28    where Balaji "kept on rattling about the poor quality" of the

Solid Waste proposal and "condescending [Saqqa] in front of"
other division managers.  (Id. at Nos. 76, 77.)  Saqqa contends
that his job was not to evaluate the substantive quality of the
submission, but rather to ensure that the proposal complied with
Department regulations and facilitate its submittal.  (Id. at
Nos. 69-73.)  Saqqa therefore argues that this criticism by
Balaji was unwarranted and indicative of a hostile work
environment.  (Id.)

Saqqa describes three other meetings, beginning in
November 2018, where Balaji behaved similarly.  (Id. at Nos. 86-
95.)  In one meeting, Balaji interrupted a presentation Saqqa was
giving to ask "I want to know whose head is going to roll if the
project goes bad" in a disrespectful and unprofessional manner.
(Id. at Nos. 87-88.)  In another, Balaji demanded to know why the
costs of a project Saqqa was working on were going up.  After
Saqqa explained that the project was taking longer than
anticipated and that unforeseen conditions had arisen, Balaji
responded by saying "that's a BS answer" and "I'm going to teach
you how to do that" in a condescending manner.  (Id. at No. 90.)
Balaji went on for another 20-30 minutes demeaning and
disrespecting Saqqa, even throwing a pen on the table.  (Id. at
No. 91.)  Finally, Saqqa describes an instance in which Balaji
criticized him for sitting in the wrong chair, even though there
were no nametags designating which person should sit in which
chair.  (Id. at No. 93-95.)

Saqqa also testified about another incident in which
Saqqa's assistant "cc'd" Balaji on an email response to Caltrans
despite the fact that Balaji was not a participant in the

8

conversation.  (Id. at No. 78.)  Balaji summoned Saqqa to his
office and proceeded to yell at him, questioning why he was cc'd
on the email and whether Saqqa could adequately run his
department.  (Id.)  Balaji instructed Saqqa to "own his mistake."
(Id.)

Finally, Saqqa describes an email he received from
Balaji concerning an analysis of whether a bridge should be
rehabilitated or replaced.  (Id. at No. 96.)  According to Saqqa,
inspectors with the Federal Highway Administration ("FHWA") and
Caltrans made a mistake in concluding that the bridge needed to
be replaced, rather than rehabilitated.  (Id. at No. 97.)  After
the County had expended considerable funds moving forward with a
replacement of the bridge, Caltrans and the FHWA informed them
that the bridge would actually need to be rehabilitated.  (Id.)
Balaji emailed Saqqa and Selling, stating that he "wanted to get
to the bottom of this as to really who messed up resulting in
loss of time and money" and "if you think we have a part in this
issue, please let me know so that I can back off."  (Id. at No.
98.)  Saqqa believes this comment was attacking his work ethic
because the only way Balaji could believe that Saqqa had a role
in the error was if he did not believe Saqqa when he told him
that the error had been Caltrans' and FHWA's.  (Id. at No. 99.)

Saqqa concedes that, in all of the above-listed
incidents, Balaji never referenced Saqqa's age, national origin,
or race in any manner.  (See Pl.'s SDF Nos. 74, 100.)  Saqqa only
recounts two instances in which Balaji made comments to him
specifically referring to his age.  First, Saqqa recounts an
instance in October 2018 when Balaji blamed Saqqa for Balaji

9

missing a meeting with an individual named Dante Nomellini.  (Id. at No. 79.)  Saqqa states that, when he arrived at the meeting with Nomellini and noticed that Balaji was not there, he called Balaji to ask him if he was coming.  (Id. at No. 80.)  Balaji screamed and yelled at Saqqa in response, asking him if he had ever verbally confirmed to Saqqa that he would be attending the meeting.  (Id.)  After Saqqa apologized and told Balaji he needed to come to the meeting, Balaji eventually arrived and "pretend[ed] like nothing happened."  (Id. at No. 82.)  After, on the way back, Balaji again started screaming and yelling at Saqqa and told him this incident would "really impact your promotion." (Id. at No. 83.)  Saqqa then responded by saying "I was unaware that you left your phone in your car," to which Balaji responded by yelling, "old managers like you need to retire."  (Id. at No. 84.)  Balaji then went and spoke with Beatriz Diaz--the employee who had set up the meeting for him--and yelled at her as well, to the point that she began crying.  (Id. at No. 85.)

Second, Saqqa states that, in his debriefing meeting with Balaji following the February 2018 interview for the ESM position, Balaji made a comment effectively stating that he had inherited old managers that were not of his choosing, and that he wanted to hire younger managers who could implement his vision for the Department.  (Pl.'s SADF No. 175.)

Saqqa also charges that, in approximately 2016, Balaji told ESM John Maguire "old managers like you need to retire." (Id. at No. 173.)  Selling also heard this comment, and testified that Balaji had made it in a "somewhat humorous manner" and was making an attempt at humor.  (Defs.' SDF No. 62.)  Saqqa and

1   other witnesses further state that Balaji made comments during

2   multiple department meetings that he needed to hire younger

3   managers and that he had gotten in trouble with HR for saying

4   that previously.  (Pl.'s SADF Nos. 174-75.)

5          Overall, Saqqa puts forth a litany of instances

6   beginning around August 2017 in which Balaji berated him for

7   mistakes associated with his job.  Saqqa contends that Balaji's

8   behavior has caused him to experience severe stress, insomnia,

9   sleep disturbance, restlessness, depressed mood, erectile

10  disfunction, anhedonia (inability to feel pleasure), decreased

11  energy, and decreased concentration.  (Pl.'s SADF No. 172.)

12          D.   <u>Post-Interview Meetings and Saqqa's Resignation</u>

13          After Balaji denied Saqqa and Vohra the ESM promotion

14  in February 2018, Saqqa requested to meet with Balaji and Selling

15  to discuss Balaji's expectations for the ESM position.  (Defs.'

16  SUF No. 47.)  Balaji told Saqqa that he was "going to help him

17  get there" and developed a department enhancement plan for Saqqa

18  to implement.  (<u>Id.</u> at Nos. 48-49.)  Balaji also lamented that he

19  wished he could "hire young managers."  (<u>Id.</u> at No. 49.)

20  Notwithstanding this comment, Saqqa testified that Balaji

21  generally seemed supportive of Saqqa reaching a position where he

22  could be promoted to the ESM position during this meeting.  (<u>Id.</u>

23  at No. 50.)

24          Plaintiff then met with Balaji three to four more times

25  on a monthly basis regarding Balaji's expectations for the ESM

26  position and Saqqa's promotional opportunity.  (<u>Id.</u> at No. 51.)

27  Though Selling was also supposed to participate, Balaji stopped

28  inviting him to the meetings.  (Pl.'s SADF No. 159.)  In response

11

to the suggestions Balaji gave Saqqa during these meetings, Saqqa
signed up for leadership classes, joined the American Public
Works Association and sought a leadership position there, applied
for and received multiple project awards, and created new
programs to recognize his staff.  (Id. at No. 158.)

As 2018 progressed, Saqqa continued to implement the
changes recommended by Balaji in their monthly meetings.  (Defs.'
SUF Nos. 52-53.)  Saqqa believes that he completed most of what
Balaji asked of him.  (Id.)  In October, Selling and Balaji met
to discuss Saqqa's efforts to meet Balaji's expectations of what
would be expected for the ESM position.  (Pl.'s SADF No. 160.)
Balaji told Selling that he was still not satisfied.  (Id.)
Balaji cited several incidents involving Saqqa in which Saqqa had
disappointed him, focusing on the Woodward Bridge project site
meeting with Dante Nomellini in particular.  (Defs.' SUF No.
107.)  Balaji told Selling that he would hold Selling personally
accountable if Saqqa were to be promoted to the ESM position and
fail during the probationary period.  (Id. at No. 110.)  Selling
responded that Balaji was "moving the goalposts again."  (Id.)
Selling also told Balaji he thought his conduct towards Saqqa was
unfair.  (Id.)  After this conversation, Selling told Saqqa that
there was "virtually no hope" of being promoted to the ESM
position.  (Id. at No. 161.)

Saqqa contends that Balaji's treatment of him, combined
with his realization that Balaji was still not satisfied with his
performance, even after implementing many of the changes demanded
by Balaji, led the workplace environment to become intolerable,
to the point that Saqqa resigned on March 29, 2019.  (Id. at No.

12

1   172.)

2          The County closed recruitment for the ESM position

3   after the February 2018 interviews.  (Defs.' SUF No. 116.)  The

4   County never appointed another candidate to the position, or even

5   considered promoting anyone else, before ultimately eliminating

6   the position in July 2020.  (Id. at No. 115.)

7   II.  Discussion

8          Summary judgment is proper "if the movant shows that

9   there is no genuine dispute as to any material fact and the

10  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

11  P. 56(a).  The party moving for summary judgment bears the

12  initial burden of establishing the absence of a genuine issue of

13  material fact and can satisfy this burden by presenting evidence

14  that negates an essential element of the non-moving party's case.

15  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

16  If the moving party has properly supported its motion, the burden

17  shifts to the non-moving party to set forth specific facts to

18  show that there is a genuine issue for trial.  See id. at 324.

19  "Where the record taken as a whole could not lead a rational

20  trier of fact to find for the non-moving party, there is no

21  genuine issue for trial."  Matsuhita Elec. Indus. Co. v. Zenith

22  Radio Corp., 475 U.S. 574, 587 (1986).  Any inferences drawn from

23  the underlying facts must, however, be viewed in the light most

24  favorable to the party opposing the motion.  See id.

25      A.   Discrimination under 42 U.S.C. § 1981

26          Saqqa first claims that defendants refused to promote

27  him to the ESM position because of his race, in violation of 42

28  U.S.C. § 1981.  (See Compl. ¶¶ 11-19.)  Saqqa's theory is that

13

1  Balaji refused to elevate him to the ESM position because he is

2  Caucasian, rather than a member of the Asian racial group like

3  Balaji.[1]  (See id.)

4          Section 1981 states in part: "[a]ll persons within the

5  jurisdiction of the United States shall have the same right in

6  every State and Territory to make and enforce contracts, to sue,

7  be parties, give evidence, and to the full and equal benefit of

8  all laws . . . as is enjoyed by white citizens."  42 U.S.C.

9  § 1981(a).  The Supreme Court has held that § 1981 bans all

10  racial discrimination in the making of public and private

11  contracts.  Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609

12  (1987).  The Ninth Circuit has further specified that the statute

13  prohibits discrimination in the employment context.  See Manatt

14  v. Bank of Am., N.A., 339 F.3d 792, 797 (9th Cir. 2003).

15          When applying § 1981 in the employment discrimination

16  and harassment context, courts apply the same standards

17  applicable to a Title VII claim.  Id. at 797; accord EEOC v.

18  Inland Marine Indus., 729 F.2d 1229, 1233 n.7 (9th Cir.1984) ("A

19  plaintiff must meet the same standards in proving a § 1981 claim

20  that he must meet in establishing a . . . claim under Title VII .

21

22          [1]  Saqqa styles his first claim in his complaint as one
   for denial of promotion "due to his race and/or color and/or
23  national origin."  (Compl. ¶ 18.)  Section 1981 does not permit
   claims for discrimination "solely on the place or nation of [the
24  plaintiff's] origin."  St. Francis Coll. v. Al-Khazraji, 481 U.S.
   604, 613 (1987).  The court will therefore not analyze Saqqa's
25  claim as one for discrimination based on his birthplace in Jordan
   and Balaji's (and Vohra's) birthplace in India.  See id.  Rather,
26  the court will analyze Saqqa's claim as one for discrimination
   based on the fact that Saqqa and Balaji (and Vohra) are of
27  different races, as the parties agree that Saqqa is Caucasian,
   while Balaji (and Vohra) are Asian.  (See Def.'s SUF Nos. 3, 12.)
28
                                  14

. . .").  Under Title VII, courts in the Ninth Circuit apply the
McDonnell Douglas burden-shifting test to evaluate claims of
intentional discrimination, "where intent itself is generally
impossible to prove."  Lindsey v. SLT Los Angeles, LLC, 447 F.3d
1138, 1144 (9th Cir. 2006) (citing McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802-03 (1973)).

Under McDonnell Douglas, a plaintiff must first
establish a prima facie case of racial discrimination.  Id.  The
burden then shifts to the defendant to prove that it had a
legitimate, non-discriminatory reason for the adverse action.
Id.  (citing McDonnell Douglas, 411 U.S. at 802).  If the
defendant meets that burden, the burden shifts back to the
plaintiff to prove that such a reason was merely a pretext for
intentional discrimination.  Id. (citing Tex. Dep't. of Cmty.
Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

1.   Saqqa's Prima Facie Case

"In a failure to promote case, the specific elements of
the prima facie case may be based on circumstantial evidence by
showing: (1) plaintiff belongs to a protected class; (2) he
applied for and was qualified for the position he was denied; (3)
he was rejected despite his qualifications; and (4) the employer
filled the position with an employee not of plaintiff's class, or
continued to consider other applicants whose qualifications were
comparable to plaintiff's after rejecting plaintiff."  Flores v.
Merced Irr. Dist., 758 F. Supp. 2d 986, 994 (E.D. Cal. 2010)
(O'Neill, J.) (citing Dominguez-Curry v. Nev. Transp. Dep't, 424
F.3d 1027, 1037 (9th Cir. 2005)).  Defendants do not contest that
Saqqa has established the first three elements of his prima facie

1   case.  Rather, they argue that Saqqa cannot establish the fourth

2   element because the County never promoted anyone outside of

3   Saqqa's race to the ESM position or even considered filling it

4   with any other candidates.  (Mot. for Summ. J. at 17-18.)

5        It is undisputed that the County eliminated the ESM

6   position in July 2020 without ever filling it.  (See Pl.'s SDF

7   No. 115.)  Saqqa has also failed to produce any evidence that

8   would allow a reasonable juror to infer that the County continued

9   to consider other applicants after rejecting him.  (See id. at

10  No. 116.)  Saqqa argues that his subsequent monthly meetings with

11  Balaji show that the County was continuing to search for a

12  candidate for the ESM position, even after the February 2018

13  interviews.  (See id.)  But Saqqa's own testimony reveals that

14  these meetings were held for the purpose of discussing what the

15  expectations were for the ESM position and how he could improve

16  his skills, not to conduct a search for the position or consider

17  other candidates.  (See Saqqa Dep. 128:22-129:11; 162:4-23.)

18  Saqqa has therefore failed to put forth sufficient evidence to

19  establish a prima facie case that he was denied a promotion due

20  to his race under McDonnell Douglas.

21  See Flores, 758 F.3d at 1037.

22        Saqqa next argues that, even if he cannot establish a

23  prima facie case under the standard set forth by defendants, the

24  Supreme Court has specifically noted that "[t]he facts

25  necessarily will vary in Title VII cases, and the specification .

26  . . of the prima facie proof required from [the plaintiff] is not

27  necessarily applicable in every respect to differing factual

28  situations." See McDonnell Douglas, 411 U.S. at 802 n.13; see

also <u>Furnco Const. Corp. v. Waters</u>, 438 U.S. 567, 575 (1978) (noting that <u>McDonnell Douglas</u>' articulation of the elements required to make out a <u>prima facie</u> case of discrimination "was not intended to be an inflexible rule").  Accordingly, Saqqa contends that, instead of requiring the plaintiff to show that the employer filled the position with a candidate of another race or continued to look for other candidates after denying the plaintiff, many courts merely require the plaintiff to show that "similarly situated individuals outside [the plaintiff's] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."  (<u>See</u> Pl.'s Opp'n at 6 (quoting <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 603 (9th Cir. 2004)).)

As an initial matter, the court notes that the case Saqqa cites to, <u>Peterson</u>, was a religious discrimination case in which the plaintiff argued that his employer failed to accommodate his religious views and ultimately terminated him due to those views.  <u>See Peterson</u>, 358 F.3d at 603-05.  And as Saqqa himself notes, the specification of the <u>prima facie</u> proof required to maintain an employment discrimination claim is highly fact-specific.  <u>See McDonnell Douglas</u>, 411 U.S. at 802 n.13. Saqqa does not explain why the version of the <u>prima facie</u> case articulated in <u>Peterson</u> would be more appropriate to apply here than the version articulated above, which numerous other courts considering claims of failure to promote have utilized.  <u>See,</u> <u>e.g.</u>, <u>Flores</u>, 758 F. Supp. 2d at 994; <u>Lyons v. England</u>, 307 F.3d 1092, 1112 (9th Cir. 2002).

17

1    Regardless, the court agrees with defendants that Saqqa

2    has failed to establish a prima facie case for failure to promote

3    even under the version of the standard set forth in Peterson.

4    Saqqa has simply failed to provide any evidence showing that a

5    similarly qualified employee of another race was treated more

6    favorably than him with regard to the ESM position, or that the

7    circumstances surrounding the denial of his promotion give rise

8    to an inference of racial discrimination.  See Peterson, 358 F.3d

9    at 603.  Undisputed record evidence shows that Balaji was vested

10   with the final authority to determine whether to promote a

11   candidate to the ESM position.  (See Pl.'s SDF No. 38.)  If

12   Balaji rejected Saqqa for promotion because he wanted to promote

13   someone of his race to the position, he had the opportunity to do

14   just that by promoting Vohra, who is the same Asian race as

15   Balaji, and who also indisputably met the minimum qualifications

16   for the position.  (See Def.'s SUF Nos. 6, 12, 27, 30.)  But the

17   undisputed facts show that Balaji denied Vohra the promotion as

18   well.  (Id. at No. 46.)  Balaji then continued to meet with Saqqa

19   to help him attain the skills necessary for the position in the

20   future, even after Vohra had resigned.  (Def.'s SUF Nos. 47-52;

21   Pl.'s SDF No. 157.)  Though Saqqa contends that Balaji was simply

22   stringing him along with no intent of helping him improve,

23   undisputed testimony shows that Balaji's dissatisfaction with

24   Saqqa's performance continued to be motivated by mistakes he

25   perceived Saqqa to be making.  (Pl.'s SADF No. 160.)

26   Even at the prima facie case stage of the McDonnell

27   Douglas test, where a plaintiff need only provide a "minimal"

28   degree of proof that racial animus underpinned the adverse

18

employment action, Saqqa has simply failed to provide evidence
that would permit a reasonable juror to infer that his denial of
promotion was motivated by Balaji's preference for members of his
own race.  See Peterson, 358 F.3d at 603-05.  Summary judgment on
Saqqa's first claim is therefore appropriate for failure to
establish a prima facie case of discrimination.  Id.  Because
failure to establish a prima facie case of discrimination is
alone sufficient to grant summary judgment on a racial
discrimination claim, see McDonnell Douglas, 411 U.S. at 802, the
court need not consider Saqqa's various arguments that the
proffered reasons for Balaji's failure to promote him were
pretextual.

         Suffice it to note here that while Saqqa contends that
Balaji's failure to promote him was driven by a preference for
members of his own race, Saqqa does not dispute that another
qualified candidate of Balaji's race (Vohra) also interviewed for
the position, and that, had Balaji wanted to promote him, he had
the exclusive authority to do so, regardless of the opinion of
other panel members.  (See Pl.'s SDF Nos. 27, 30.)  Given that
Balaji ultimately decided not to promote Vohra for the same
stated reasons as Saqqa, Saqqa simply cannot show that any
favoritism on the part of Balaji signals that his stated reasons
for denying Saqqa's promotion were actually a pretext for racial
discrimination.

         B.   Race Harassment under § 1981

         Saqqa next claims that Balaji created a hostile work
environment and harassed him based on his race in violation of 42

19

U.S.C. § 1981.[2]  (Compl. ¶¶ 20-24.)  To establish a hostile work
environment claim under § 1981, a plaintiff must show that (1) he
was "subjected to verbal or physical conduct" because of his
race; (2) "the conduct was unwelcome," and (3) "the conduct was
sufficiently severe or pervasive to alter the conditions of his
employment and create an abusive work environment."  Manatt, 339
F.3d at 798.  To state a cognizable claim, the plaintiff must be
able to show that he was harassed because of his race.  See
Kortan v. California, 5 F. Supp. 2d 843, 850 (C.D. Cal. 1998)
("The Supreme Court recently stressed [that] . . . harassment
must come because of the plaintiff's protected characteristic."
(citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,
77 (1998)).

        "Section 1981, like Title VII, is not a 'general
civility code.'"  Id. (quoting Faragher v. City of Boca Raton,
524 U.S. 775, 788 (1998)).  "[S]imple teasing, offhand comments,
and isolated incidents (unless extremely serious) will not amount
to discriminatory changes in the terms and conditions of
employment."  Faragher, 524 U.S. at 788.

        Saqqa's claim for racial harassment fails because he

---

        [2]  Saqqa's complaint states that his second and third
claims for harassment in violation of 42 U.S.C. § 1981 and
California Government Code § 12940(j) are brought "against all
defendants."  (Compl. ¶¶ 20-29.)  Neither party has addressed the
issue of whether the County may be held vicariously liable for
Balaji's actions under either statute.  Regardless, because Saqqa
only alleges that the County is liable based on the actions of
Balaji, and, as explained below, no genuine issue of material
fact exists as to whether Balaji harassed Saqqa based on his race
or age, the court will grant summary judgment in favor of the
County as to Saqqa's second and third claims for racial and age
harassment as well.

has not produced any evidence which would lead a reasonable juror to conclude that Balaji's allegedly harassing conduct was motivated by Saqqa's race.  To be sure, Saqqa details numerous instances in which Balaji berated him or yelled at him in response to perceived mistakes on the part of Saqqa or those in his department.  (See Pl.'s SDF Nos. 60-106; Pl.'s SADF Nos. 151-172.)  Yet, Saqqa does not dispute that Balaji never referred to Saqqa's race or the race of any other employee--expressly or otherwise--in any of these instances.  (See Pl.'s Opp'n at 16-17.)

Saqqa contends that, although Balaji's conduct was not overtly racial, a jury could infer that he was motivated by race because evidence shows that Balaji did not yell, scream at, or berate people of his own race as frequently or in the same manner as Saqqa.  (See id.)  Saqqa points to two pieces of evidence in support of his contention.  First, in his own declaration, Saqqa states that he never observed Balaji similarly belittle or berate a person of Balaji's own Asian race, including Vohra.  (Pl.'s SADF No. 172.)  Second, Saqqa points to the declaration of one of his coworkers, David Mendoza, in which Mendoza states that Balaji "regularly exhibits favoritism to a select few."  (Pl.'s SADF No. 168.)  "These few have been given opportunities not offered to others and are not berated, belittled, or humiliated . . . ."  (Id.)  "Mr. Balaji has repeatedly shown this type of bias between managers who share the same religion/ethnicity as him and those who don't."  (Id.)

Saqqa's argument fails for two reasons.  First, the Ninth Circuit has specifically cautioned that "a conclusory,

21

self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997).  Both Saqqa and Mendoza's declarations are overly vague and conclusory in describing Balaji's alleged treatment of managers outside his own race.  Neither Saqqa nor Mendoza describe any specific incidents in which Balaji failed to discipline a member of his own race in the same manner as he did Saqqa, or set out any foundation for how they were aware of the race of any other County employee to whom they refer.  (See Pl.'s SADF Nos. 168, 172.)  Mendoza's declaration does not even specify that Balaji's alleged mistreatment of certain managers was based on their race--he states that Balaji exhibited bias due to other employee's "religion/ethnicity."  (Id.)

          Without some additional factual detail explaining why the declarants were able to conclude that Balaji was acting with discriminatory animus, rather than simply criticizing employees for a race-neutral reason, there is simply no foundation for an inference that Balaji lacked animus towards those of his own race or harbored racial animus towards others, including Saqqa.  See Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995) (holding that, "absent some probative evidence that [defendant's] petulance stemmed from something other than a race-neutral reaction to the stressful encounter," there was no basis upon which to conclude the presence of racial animus).  Saqqa and Mendoza's declarations are therefore exactly the sort of conclusory and self-serving affidavits the Ninth Circuit has warned are insufficient to survive summary judgment when

22

1  presented without corroborating evidence or additional, detailed

2  facts.  <u>See</u> <u>Clearing House</u>, 104 F.3d at 1171.

3          Second, Saqqa does not point to any authority

4  suggesting that the absence of harassment toward members of one

5  race necessarily implies a motivation of racial discrimination

6  towards another.  In fact, both cases cited by Saqqa involved

7  cases where the defendants directed numerous extremely offensive

8  racial epithets at the plaintiff.  In <u>McGinest v. GTE Service</u>

9  <u>Corp.</u>, 360 F.3d 1103, 1114 (9th Cir. 2004), employees of the

10  defendant referred to the plaintiff as a "stupid ni***r" and

11  regularly placing racist graffiti such as "ni***r" and "white is

12  right" in the bathroom and on equipment.  And in <u>Reynaga v.</u>

13  <u>Roseburg Forest Prods.</u>, 847 F.3d 678, 687-88 (9th Cir. 2017),

14  employees of the defendant told the plaintiff, who was Mexican,

15  that the border should be closed to "keep motherfuckers like you

16  from coming up here and killing our elk," and, knowing the

17  plaintiff's wife was Native American, referred to Native American

18  women as "nasty fat squaws."

19          There is simply no analogous evidence in the record

20  here which would suggest that Balaji's conduct toward Saqqa was

21  based on his race.  Accordingly, no reasonable juror could

22  conclude that Balaji harassed Saqqa on that basis.  <u>See</u> <u>Manatt</u>,

23  339 F.3d at 798.  The court will therefore grant summary judgment

24  in favor of defendants as to the complaint's second claim.[3]

25          [3]    Saqqa's second claim for racial harassment under 42

26  U.S.C. § 1981 contains an allegation that, due to Balaji's
   hostile treatment, Saqqa was left with no reasonable choice but

27  to resign his position at the County, and therefore was
   constructively terminated by the County.  (Compl. ¶ 22.)  To the

28  extent that Saqqa attempts to raise an additional claim for

1       C.    Harassment under Cal. Gov't Code § 12940(j)

2             Saqqa's third claim is that Balaji harassed him and

3   created a hostile work environment "based on [Saqqa's] opposition

4   to Defendant's attempt to engineer a discriminatory promotion as

5   alleged above, and Plaintiff's age (Plaintiff was born in 1961)."

6   (Compl. ¶¶ 25-29.)  Under California's Fair Employment and

7   Housing Act ("FEHA"), it is unlawful for an employer to harass an

8   employee based on "race, religious creed, color, national origin,

9   ancestry, physical disability . . . age . . . or veteran or

10  military status."  Cal. Gov't Code § 12940(j)(1).

11            A prima facie case of a hostile work

12  environment/harassment claim under FEHA contains similar elements

13  as a § 1981 harassment claim: a plaintiff must establish that (1)

14  he is a member of a protected class; (2) he was subjected to

15  unwelcome harassment; (3) the harassment was based on the

16  plaintiff's protected status; and (4) the harassment unreasonably

17  interfered with his work performance by creating an intimidating,

18  hostile, or offensive work environment; and (5) defendants are

19  _____

20  wrongful termination in violation of public policy against the
    County, the court finds that it is subject to summary judgment as
21  well.  Not only would a wrongful termination claim be premised on
    the same claims of race and age harassment for which the court
22  has already determined defendants are entitled to summary
    judgment, see Thompson v. Wiener, No. CV 08-991-PHX-GMS, 2008 WL
23  5068945, at *8 (D. Ariz. Nov. 25, 2008) ("a constructive
    discharge claim cannot be maintained unless there is another
24  legally cognizable injury present"), Saqqa is also barred by
    statute from maintaining a common law claim for wrongful
25  termination against a public entity such as the County.  See Cal.
    Gov. Code § 815; Miklosy v. Regents of Univ. of Cal., 44 Cal. 4th
26  876, 899 (Cal. 2008); see also McAllister v. Los Angeles Unified
    Sch. Dist., 216 Cal. App. 4th 1198, 1219 (2013) ("Miklosy made it
27  clear that a claim for wrongful discharge in violation of public
    policy may not be brought against a public entity.").
28
                                  24

1   liable for the harassment.  Ortiz v. Dameron Hosp. Ass'n, 37 Cal.
2   App. 5th 568, 581 (3d Dist. 2019).

3          "[A]n employee claiming harassment based upon a hostile
4   work environment must demonstrate that the conduct complained of
5   was severe enough or sufficiently pervasive to alter the
6   conditions of employment and create a work environment that
7   qualifies as hostile or abusive to employees because of their
8   [protected status]."  Id. (quoting Miller v. Dep't of Corr., 36
9   Cal. 4th 446, 462 (Cal. 2005)).  "The harassment must satisfy and
10  objective and a subjective standard."  Id.  "The objective
11  severity of harassment should be judged from the perspective of a
12  reasonable person in the plaintiff's position, considering all of
13  the circumstances."  Id.

14          "[A]nnoying or 'merely offensive' comments in the
15  workplace are not actionable."  Lyle v. Warner Bros. Television
16  Prods., 38 Cal. 4th 264, 283 (Cal. 2006) (quoting Harris v.
17  Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).  "Harassment
18  cannot be occasional, isolated, sporadic, or trivial; rather, the
19  plaintiff must show a concerted pattern of harassment of a
20  repeated, routine, or generalized nature."  Aguilar v. Avis Rent
21  A Car Sys., Inc., 21 Cal. 4th 121, 130 (Cal. 1999).  And, of
22  course, like a claim for harassment under § 1981, the harassment
23  must be based on the plaintiff's protected status.  Ortiz, 37
24  Cal. App. 5th at 581.

25          Here, Saqqa's claim that Balaji harassed him based on
26  his opposition to Balaji's "attempt to engineer a discriminatory
27  promotion" fails as a matter of law, as this is a not a protected
28  class under FEHA.  See Cal. Gov't Code § 12940(j)(1) (listing

1    protected classes).

2          Saqqa's claim that Balaji harassed him based on his age
3    also fails, as Saqqa cannot produce evidence that Balaji made
4    more than a few stray comments to Saqqa based on his age, none of
5    which were particularly severe.  See Ortiz, 37 Cal. App. 5th at
6    581.  Only two comments directed at Saqqa by Balaji expressly
7    reference Saqqa's age.  Once, while debriefing with Saqqa
8    following the February 2018 interviews, Balaji stated that he had
9    inherited older managers and needed to hire younger ones. (Defs.'
10   SUF Nos. 49, 84.)  Then, after blaming Saqqa for his missing a
11   meeting with Nomellini, Balaji yelled "old managers like you need
12   to retire."  (Id.)

13          Other witnesses confirm that they occasionally heard
14   Balaji make comments similar to these in quarterly meetings, but
15   none of them state that these comments were made in reference to
16   Saqqa. (Defs.' SUF Nos. 61-62; Pl.'s SADF Nos. 173-74.)  Saqqa
17   also recalls one instance in 2016 when he heard Balaji tell
18   another individual that old managers like him needed to retire.
19   (Pl.'s SDF No. 61.)  Selling recalls hearing this comment, but
20   describes Balaji as having made it in a joking manner as an
21   attempt at humor.  (Id. at No. 62.)

22          At most, Balaji's comments to Saqqa appear to be stray
23   remarks made among a series of sporadic references to age.  See
24   Stevens v. Cnty. of San Mateo, No. C 04-02762 SI, 2006 WL 581092,
25   at *5 (N.D. Cal. Mar. 7, 2006) (holding that several age-based
26   comments were neither severe nor pervasive enough to constitute
27   hostile work environment, including telling the plaintiff he was
28   a "stupid old man making up rules" and "you are an old lion and

in my country we kill old lions"). They do not appear to be a pervasive course of conduct that fundamentally altered the conditions of Saqqa's employment or impaired his ability to do his job due to their abusive nature. See Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 870 (9th Cir. 2001) (finding that the plaintiff had experienced a hostile work environment where he was subjected to a "relentless campaign of insults, name calling, and vulgarities" which occurred "at least once a week and often several times a day").

Neither do these comments rise to the level of severity courts typically require under FEHA. In Eyraud, 2018 WL 2157176, at *3, for instance, the court held that a "reasonable jury could not find that the singular instance of Brown publicly asking plaintiff, 'Exactly how old are you?' was severe, threatening, or humiliating enough to unreasonably interfere with [plaintiff's] work performance or create a hostile work environment." The court also held that another employee telling the plaintiff that he was "old and brittle" may "be offensive, but a reasonable jury would not find it created a hostile work environment." Id.

Similarly here, remarks indicating that Balaji needed to hire younger managers or that old managers need to retire are simply not severe or humiliating enough to maintain a claim for age harassment under FEHA. Though they may be offensive, a "reasonable jury would not find [they] created a hostile work environment" or interfered with Saqqa's employment. See id. In fact, undisputed testimony indicates that, when Balaji made the first of these comments to Saqqa, Saqqa himself felt that Balaji was being supportive of him and trying to get him to the point

27

1  where he could be promoted to the ESM position.  (Defs.' SUF No.
2  50.)

3          Saqqa argues that, even though only a few of Balaji's
4  comments expressly invoked his age, the fact that Balaji
5  occasionally referenced his age would allow a jury to reasonably
6  infer that his numerous other outbursts directed at Saqqa were
7  also driven primarily by Saqqa's age.  To be sure, even comments
8  or conduct that do not overtly refer to the plaintiff's age may
9  give rise to an inference that the comments were driven by
10  discriminatory animus when they are part of a larger pattern or
11  only directed at members of a certain class.  See, e.g., Kang v.
12  U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002) (conduct of
13  requiring harder work and more hours contributes to racially
14  hostile work environment if required because of race).  But,
15  here, Saqqa's own sworn testimony is that he did not believe that
16  Balaji made those comments due to his age.[4]  (Defs.' SUF No.
17  102.)  In the light of this admission by the plaintiff, no
18  reasonable juror could conclude that any of the comments made by
19  Saqqa in which he did not reference Saqqa's age were in fact
20  driven by discriminatory animus.  See Ortiz, 37 Cal. App. 5th at

21

22          [4]  At deposition, Saqqa was asked: "Those instances that
    you've testified to [of alleged harassment by Balaji], did you
23  believe that those -- that Mr. Balaji was engaging in that
    conduct due to your age?"  (Saqqa Dep. 239:24-240:2.)  Saqqa
24  answered "No."  (Id.)  Saqqa argues that, because defense counsel
    asked him a question phrased in the past tense (i.e., "did you
25  believe" as opposed to "do you believe"), he was only answering
    as to his past state of mind (i.e., before the time of his
26  deposition).  It strains credulity, however, to believe that, by
    answering "no," Saqqa was trying to draw some distinction between
27  his beliefs before the deposition and his beliefs at the time of
    his deposition.
28

1  581.

2         Because a reasonable person in Saqqa's position would

3  not find Balaji's comments to be sufficiently severe or pervasive

4  to interfere with Saqqa's work performance, and no reasonable

5  juror could find that Balaji's other criticisms of Saqqa were

6  made because of his age, no genuine issue of material fact exists

7  as to Saqqa's third claim.  See id.  The court will therefore

8  grant summary judgment in favor of defendants as to Saqqa's third

9  claim.

10         IT IS THEREFORE ORDERED THAT defendants' motion for

11  summary judgment (Docket No. 14) be, and the same hereby is,

12  GRANTED.

13         The Clerk of Court is instructed to enter judgment in

14  favor of defendants and against plaintiff.

15

16  Dated:  September 8, 2021

        WILLIAM B. SHUBB
17      UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28